## THE MINNETONKA.

### (District Court, S. D. New York. July 7, 1904.)

1. ADMIRALTY—PASSENGER'S JEWELS — THEFT — TICKETS — LIABILITY—EXEMPTIONS—VALIDITY.

Conditions of a steamship passenger ticket exempting the ship from liability for loss of passenger's effects by theft or any act of neglect or default of the shipowner's servants or other persons for whose acts he is responsible, and valuing passenger's baggage at £20, in the absence of a bill of lading therefor, and the payment of an additional freight charge for transportation, and exempting the ship from liability under any circumstances for jewelry, etc., unless declared and delivered into the per-

sonal custody of the chief steward or purser of the vessel, were unreasonable, and contrary to public policy.

**2. SAME—SIGNING TICKET.**

The fact that the ticket containing such provisions was handed to the passenger, who filled in some blank spaces under a caption, "Passengers will please fill in the following information required for United States authorities," disclosing certain particulars relating to herself and traveling companion, did not render such provisions binding on her, it appearing that she never read nor adopted them.

**3. SAME—EVIDENCE.**

Libelant and her traveling companion purchased ocean steamship tickets, and, after eating their first meal on board, libelant placed her jewels in a hand bag, and at once went to the purser's room to place the bag in his care. She was unable to obtain admittance, and finally notified the steward of her desire, who promised to inform her as soon as the purser returned. Libelant waited in her stateroom until 12 o'clock at night, when her room was entered by a man in steward's uniform, who seized the bag and fled. Libelant immediately notified the officers of the ship, but the bag was not again found. *Held*, that the facts established a cause of action for theft by the ship's servants, for which it was liable.

**4. SAME—STATUTES.**

Rev. St. § 4281 [U. S. Comp. St. 1901, p. 2942], providing that shippers of jewelry, including precious stones, shall, when lading the same as freight or baggage, give to the agent of the ship a written notice of the true character and value thereof, and have the same entered on the bill of lading, otherwise the owner of the vessel shall not be liable beyond the value according to the notice, does not apply to a case where a passenger took such of her jewelry as she was accustomed to wear aboard, and was robbed thereof the first night out, before she succeeded in depositing it with the purser, without any fault on her part.

**5. SAME—FILING CLAIM—TIME.**

Where a steamship was made fast to the wharf at her destination at 2:10 p. m. on November 10, 1903, and a passenger mailed a notice of her claim for loss of jewels by theft of the ship's servants at 5:30 p. m. on November 12, 1903, which notice was received by the steamship's agent the morning of the 13th, the notice was given in substantial compliance with a condition of a ticket requiring claims to be presented within 48 hours after the passengers are landed.

**6. SAME—CONTRIBUTORY NEGLIGENCE.**

Where a passenger had not finally retired for the night at the time her stateroom was entered and her jewelry stolen, but she was expecting the purser, so that she could place the jewels in his charge, and it was necessary that the door should be left open for ventilation, her failure to shut and bolt the same was not contributory negligence.

Louis H. Porter, for libellant.

Convers & Kirlin and John M. Woolsey, for claimant.

ADAMS, District Judge. This action was brought by Frances M. Barnes, a passenger on the steamship Minnetonka, on a voyage from London, England, to New York, to recover the value of certain jewels and money said to have been lost by theft during the voyage, which commenced on the 31st day of October, 1903, and ended on the 11th day of November following.

The libel sets forth that the steamship, then lying in the port of London, was advertised to sail on or about the 30th day of October for New York and that tickets for the carriage of passengers and their baggage to New York would be sold by an agent of the Atlantic Transport Company, Limited; that the libellant in accordance with the ad-

vertisement, called at the office of the company and purchased a ticket for herself and niece, Miss Georgia Mudgett, who was travelling with her, paying therefor £15 and that it was agreed by the company that the libellant should be safely transported on the said voyage, together with her baggage and personal effects; that the libellant thereafter embarked on the said steamship and was assigned to room No. 48; that after sailing, the libellant having in her possession valuable jewels and money, called at the office of the purser of the vessel for the purpose of depositing them with him, but was unable to obtain admittance to the office and thereafter called a steward of the ship and requested him to notify the purser that she desired to place her said jewels and money in his custody during the voyage; the steward departed but shortly returned and informed the libellant that the purser was not in his room and was engaged but the steward would advise her as soon as the purser could be seen and receive the valuables; that the libellant accordingly waited in her room to hear from the purser and place the property in his custody and while so waiting, she placed the valuables in a small handbag and put it in a rack next to where she was lying; that thereafter the door of the room was suddenly thrown open and a man dressed in the uniform as worn by the stewards on the steamship ran into the room, seized the bag and carried it away; that the libellant screamed and rang the bell for a stewardess and called but it was a long time before she obtained any response or answer and when a steward did finally respond to the calls and had aroused the ship, the officers wholly failed to recover her said property or to restore the same to her; that the value of the stolen property was in excess of $5,000; that the next day, the libellant communicated with the captain and other officers of the ship but they wholly failed to restore the property to her; that the theft of said property was done by a servant and employee of the ship and rendered possible by reason of the carelessness and negligence of the officers and employees of the ship and that her owners and officers violated the contract for the safe carriage of the libellant and that they suffered and permitted the robbery and neglected to restore the property to her.

The answer admits the advertisement as alleged, the purchase of the ticket, the embarkation of the libellant and companion and assignment to room No. 48, the sailing of the steamship, the ringing of a bell for a steward, the communication of the loss to the captain and officers of the ship, the safe arrival of the ship in New York, but denies the other matters alleged by the libellant, including any information sufficient to form a belief as to what property, if any, the libellant had in her possession when she embarked, or what disposal she made of it, or what the value was, if any, and then sets up as an alternative and separate defense the conditions and provisions of the ticket, as follows:

"It is a condition upon which this ticket is granted, and is mutually agreed for the consideration aforesaid that  *   *   *

(c) The Shipowner and the Passage Broker or Agent, are not, under any circumstances, liable for loss, death, injury, or delay, to the passenger, or his baggage, arising from the act of God, Public Enemies, Fire, Robbery, Theft, or Pilferage, of whatever kind and whether on board the Steamer or not *  *  * or from any act, neglect, or default of the Shipowner's Servants, or other persons, for whose acts he is responsible, whether on board the Steam-

er or not, or on board any other vessels belonging to the Shipowner, either in matters aforesaid, or otherwise howsoever. ❊ ❊ ❊

(d) The Shipowner or Passage Broker, or Agent, shall not under any circumstances, be liable for any loss or delay of, or injury to Passenger's Baggage, carried under this ticket, beyond the sum of £20, at which such baggage is hereby valued, unless a bill of lading be given therefor, and freight paid in advance on the excess value at the rate of £1 per cent, or its equivalent, in which case the Shipowner shall only be responsible according to the terms of the Shipowner's form of cargo bill of lading in use from the port of departure. The Shipowner and the Passage Broker, or Agent, are not responsible to any extent, or under any circumstances, for Gold or Silver, in whatever state, money, jewellery, precious stones, watches, clocks, paintings, engravings, title deeds, or other writings, bills, bank notes of any country, orders, notes, or securities for payment of any money, or of silks, furs, laces or cashmere in whatever state, or any other valuable property of the like description, contained in any baggage, unless declared, and the value thereof stated in writing, and unless the same be delivered into the personal custody of the Chief Steward or Purser of the Vessel, and then the Shipowner shall not be liable beyond the sum of £20, or its equivalent, unless freight be paid in advance on any value exceeding the sum aforesaid, at the rate of £1 per cent, in which case Shipowner will carry the goods subject to the conditions contained in the Shipowner's form of Cargo bill of lading in use from the port of departure.

(e) No claims shall be available against the Shipowner or his property or the Passage Broker or Agent, unless notice in writing thereof with full particulars of the claim be furnished to the Shipowner within 48 hours of the passengers being landed from the Trans-Atlantic Ocean Steamer at the termination of her voyage, or in case of the voyage being abandoned or broken up within seven days thereafter."

The answer alleges that the above conditions were printed, with others, underneath the words "Notice to Passengers" in large clear type, and that below the conditions were certain blanks to contain information desired by the United States Revenue authorities, which were filled in by the libellant, or her representative.

The answer further alleges:

"The description of her baggage and that of her companion who shared her stateroom, and traveled under the same ticket, contained the following items, and no others: 'Two steamer and two canvas covered trunks.' The number of pieces was given as 4, and the marks as 'F. M. B., New York,' and 'G. E. M., New York,' the said initials 'G. E. M.' referring, as the claimant is informed and believes, to her fellow traveler who occupied the stateroom with the libelant, and who gave her name as Georgia Mudgett.'

No jewelry was declared by the libelant, nor given nor offered to be given in charge of the Purser or steward of the Steamship Minnetonka, or of any other member of the crew of the said steamship, or of any one for whom the steamship or her owners or the claimant may have been responsible, although there was a notice in her room stating that the Purser would, when requested, take charge of money, jewelry, etc. for safe keeping; nor did she pay any extra freight therefor, as is provided in the ticket under which she was carried, but, if she had any jewelry with her, she retained it in her own custody and possession and assumed all the responsibility for its safe keeping.

The claimant alleges that if the libelant did lose any jewelry, as she states in her libel, or otherwise, that the said loss was due to causes within the exceptions and exemptions hereinbefore set forth which were contained in the ticket which she accepted, and signed, or caused to be signed with her name, or else that it was due to the negligence of herself or of her companion, without any negligence or lack of care whatsoever on the part of the officers or crew of the Steamship Minnetonka, or of any one for whom the steamer, her owners or the claimant may have been responsible.

The claimant further alleges that the voyage of the Minnetonka was not abandoned, or broken up, but that it was duly prosecuted, and that she arrived at her New York dock at or about 1 p. m. on November 10, 1903, and immedi-

ately thereafter the libelant was safely landed, but that no notice in writing of the libelant's claim was furnished to the shipowner within 48 hours after she landed in New York, as is required by the provisions of the ticket hereinbefore set forth.

*Twelfth:* Further answering, and as a separate and alternative defence herein, the claimant alleges that, if the libelant brought on board the Steamship Minnetonka the jewelry that she alleges she had with her, she did not, at the time of bringing it on board, give to the master, clerk, agent, or owner of the Steamship Minnetonka a written notice of the true character and value of her jewelry, although, if she did bring any such goods on board, she was a shipper of Gold, Jewelry, Precious Stones and Precious metals as baggage, and that, therefore, under the Revised Statutes of the United States, § 4281 [U. S. Comp. St. 1901, p. 2942], neither the master, nor owner of the Minnetonka is liable as a carrier of the said jewelry in any form or manner."

The testimony shows that the libellant, accompanied by her niece, on the 27th of October, negotiated the purchase of the ticket as alleged, at the steamship company's London office, near the Carlton Hotel, where they were staying, and that the purchase was completed the next day, when the ticket was sent to the libellant at the hotel. At the time of negotiation, the libellant filled out certain particulars relating to herself and niece in her own handwriting on the ticket in the spaces left blank for such purpose. The clerk in the steamship office passed her a pen and pushed the ticket to her, but the conditions of the ticket were not read by the libellant nor her attention especially called to them. When the passengers went aboard the steamship at the Tilbury Dock, they were assisted to their room, an outside one on the starboard side of the ship, by one of the steamship's stewards. When they reached there, it was found not to be large enough for their trunks and an opposite stateroom was allowed by the purser for their accommodation in such respect. After this was arranged and they got out of their trunks such articles as were needed for immediate use, they went to dinner, the libellant wearing some of the jewelry which was subsequently stolen, and spent about 10 or 15 minutes at the table. They then went up to their stateroom to get some wraps and proceeded to the purser's office, which was forward on the port side of the ship, to deposit the bag in which some of the jewels had been placed, but upon knocking at the door they got no response and found it was locked. This was about ¼ before eight. The ladies then went upstairs and sat in the saloon until about ½ after eight. The libellant again went to the purser's room for the purpose of depositing the bag but he was not found there and she returned to the saloon, where they remained for about ½ an hour, then went together to the purser's room for the same purpose, but he was still out; at least, they got no response to their knock at the door. They then went to their stateroom where they partially disrobed and sat talking till after 12 o'clock. The steward Betts appeared during this time saying, in answer to their question, he was going to lock the extra stateroom, and observed the libellant remove an article of jewelry from the under waist of her dress and place it in the bag, which she put in the rack over her berth. She then told the steward to go and see if the purser was in his room as she wished to deposit the bag of valuables with him. The steward went away and returned in a few minutes, saying the purser was not there and explained that there had been some trouble about the passenger's baggage which the purser

was trying to straighten out. The libellant then requested the steward to let her know when the purser came to his room, which the steward promised to do but did not return for such purpose.

The libellant and her niece sat together in the stateroom talking for a further time and then the niece retired to her berth, which was the upper one. The libellant partially reclined in the lower berth reading for a time. She became sleepy and concluded that she would not hear from the purser and had better put her bag under the mattress for the night, when, having dozed off, she became conscious that there was some stranger in the room and saw a man standing in the middle of it, in a steward's blue uniform, with brass buttons on it, and wearing a cap with a visor on it, the cap being pulled down to partially screen the face. The libellant says that he took a step to the side of her berth, and reaching over seized the bag containing the valuables with his left hand, opened the door with his right hand, and stepped out of the room with the bag, slamming the door behind him. Immediately upon seeing the man, the libellant screamed and called to her niece, who was awakened and heard the door slam. Both of the ladies immediately got out of their berths, rang the steward's bell several times without a response, then the libellant ran down the companion way and out in the hall or square to the pantry, screaming for a steward or stewardess all the time but without response. She then returned to her room and there continued the screaming and ringing of the electric bell. Finally, one of the stewards, Phillips by name, who was acting as night watchman, appeared and was notified of the robbery and requested to call the purser or captain. After waiting a time, estimated by them at 15 or 20 minutes, not hearing anything from the officers, they went to the purser's office and knocked without response. While knocking, Phillips came up behind them, and saying he would awaken the purser, went into his room and the purser was awakened and told of the robbery. Subsequently the master was advised of it. At first both officers were given the impression by the steward that simply a purse had been lost by one of the passengers and they had no intimation of the robbery until some little time after it happened.

I was favorably impressed by the demeanor of these ladies in testifying and I credit and adopt their version of the robbery of the bag and contents. The demeanor of the stewards on the other hand was not favorable to a belief of their account of what took place. I conclude that the libellant was robbed as she contends and probably by one of the stewards. Apparently, no one but Betts knew of the libellant's possession of the valuables and there seems to be no way of accounting for their disappearance except by supposing that he carried them off, perhaps with the connivance of Phillips. No trace of the valuables was found afterwards, though reasonable efforts were made to find them and it remains to be determined whether the steamship can find exemption from liability by reason of the terms of the contract.

The claimant's points are:

"1st. The conditions and limitations on the ticket constituted a part of the contract of carriage in this case, and are valid and binding on the libelant.

a. The libelant knew of the conditions and limitations on the back of the ticket, or must be presumed to have had notice of them, and to have assented

to them, by reason of the fact that she signed her name and filled out various other particulars concerning herself and her baggage underneath the 'NOTICE TO PASSENGERS' on the back of the ticket.

b. The exemptions from and limitations of liability in the ticket, which are expressly pleaded, are reasonable and valid.

2nd. In view of the valid exceptions in the contract of carriage and of the fact that the loss is claimed to have been due to one of the excepted clauses, the libelant, in order to make out her case, must prove that it was due to some negligence on the part of the steamship.

3rd. The libelant is precluded from recovering for the loss of her jewels in this case by the provisions of section 4281 of the United States Revised Statutes [U. S. Comp. St. 1901, p. 2942].

4th. The libel cannot be maintained by reason of the fact that notice of the claim for damages was not given to the agent of the Company at New York within forty-eight hours of the time when the passengers landed from the steamer.

5th. The libelant has failed to prove by a preponderance of evidence that it was a steward or one of the ship's company who took her bag on the night of the alleged theft.

6th. Even if the Court should hold that the theft was accomplished by one of the stewards of the Minnetonka, nevertheless the libelant cannot recover, because the steamship is not responsible for the wilful acts or crimes of its employés outside of the course of their duty.

7th. Inasmuch as the libelant retained the exclusive custody and control of her jewels the steamship is only liable for their loss if negligence is shown.

8th. The steamship is not liable for the loss of Mrs. Barnes' jewelry, for the reason that the proximate cause of the loss was her own negligence in leaving her door unlocked, when she had her jewelry in her personal custody."

1. Assuming that the libellant knew or was bound to know, the conditions printed on the back of the ticket, still they are not binding upon her, because they were not reasonable, nor in accordance with the requirements of public policy. The latest authority upon this point seems to be The Kensington, 183 U. S. 263, 22 Sup. Ct. 102, 46 L. Ed. 190. This was an action against the ship for failure to deliver a passenger's baggage, which was destroyed by rough weather on account of bad stowage. That was a case decided by this court—88 Fed. 331—affirmed by the Circuit Court of Appeals—94 Fed. 885, 36 C. C. A. 533—and then reviewed by the Supreme Court, through a writ of certiorari, where the decisions, limiting the petitioners' recovery to a stipulated amount, were reversed and it was held that the passengers were entitled to recover the actual amount of their loss, notwithstanding certain exemptions from liability and limiting the amount, on the passengers' ticket. The Supreme Court in part said, in an opinion by Mr. Justice White (pages 268, 275–277, 183 U. S., pages 104, 107, 22 Sup. Ct., 46 L. Ed. 190):

"It is settled in the courts of the United States that exemptions limiting carriers from responsibility for the negligence of themselves or their servants are both unjust and unreasonable, and will be deemed as wanting in the element of voluntary assent; and, besides, that such conditions are in conflict with public policy. This doctrine was announced so long ago, and has been so frequently reiterated, that it is elementary. We content ourselves with referring to the cases of the Baltimore & Ohio &c Railway v. Voigt, 176 U. S. 498, 505, 507 [20 Sup. Ct. 385, 44 L. Ed. 560], and Knott v. Botany Mills, 179 U. S. 69, 71 [21 Sup. Ct. 30, 45 L. Ed. 90], where the previously adjudged cases are referred to and the principles by them expounded are restated."

*      *      *      *      *      *      *      *      *

"It remains only to consider whether, although the conditions found in the ticket be void because against public policy, recovery for the baggage lost must

be limited to the sum of 250 francs because of the statement of that amount in one of the provisions of the ticket. It is to be doubted whether in reason it can be said that the limit as fixed in the ticket can be separated from the context in which it is found, and to be deemed to be an independent valuation fixed by the parties irrespective of the right to name an increased sum stated in the same provision of the ticket which contains the valuation. But if it can be treated as a separate valuation, unaccompanied by the conditions attached to it, and from which it takes its origin, then the question is this: Is it just and reasonable for a transatlantic carrier to put an absolute limit of 250 francs, about the equivalent of $50, as the value of the baggage of a cabin passenger, whether first or second class, and to refuse, except upon illegal conditions, to allow any greater sum to be carried as baggage? In The Majestic, 166 U. S. 375 [17 Sup. Ct. 597, 41 L. Ed. 1039], the liability of the ship for baggage was under consideration. No contention was made that the ticket was not a contract, but the question was whether the conditions printed on the back were a part of the assumed contract and, if so, were they valid. One of the conditions limited recovery to £10 for each passenger, unless a greater sum was declared and paid for. The right to declare the larger value was not burdened with the illegal condition found in the ticket now under consideration. Had it been otherwise, the requirement would not have had the same significance, as the ticket considered in The Majestic was issued prior to the adoption of the Harter Act, and, therefore, whether the baggage was carried as such, or as cargo, it would have equally enjoyed an immunity from loss, brought about by the negligence of the carrier, or his servants. The ticket considered, in The Majestic as does the one now before us, allowed a capacity of 'twenty cubical feet of luggage for each person'. The court, in The Majestic, commenting on the restriction to £10 for each passenger, said it was a (page 386 [166 U. S., page 602, 17 Sup. Ct., 41 L. Ed. 1039]) 'limitation which, we must say, does not strike us as exactly reasonable, in view of the 'twenty cubical feet of luggage which the company had expressly contracted to carry. * * *' It was decided, in The Majestic, that, even on the hypothesis of a contract, evidenced by the ticket, the conditions on the back were not binding. The present case does not require us to decide whether the sum of 250 francs would be a reasonable limit if the right to fix a larger amount was not incumbered with the illegal and arbitrary conditions which are here presented. We express no opinion on such question. Manifestly, what is a reasonable maximum amount when a larger value is allowed to be carried as baggage by paying an additional compensation, is a different question from what is a reasonable amount where the right to declare and pay for a larger sum is refused, or what is equivalent thereto is permitted only upon condition that the passenger subjects himself to conditions which are void as against public policy. Indeed, the Circuit Court of Appeals adverted, in its opinion in this case, to the suggestion made in The Majestic, and said that the limit of 250 francs was reasonable, because of the right given the passenger to increase the amount by paying a larger but reasonable compensation. As we hold that no such right was allowed because its enjoyment was burdened with conditions which were void because against public policy the only reason upon which the justness of the limit was sustained ceases to apply."

The Kensington is not strictly in point with the case under consideration but the opinion as a whole is favorable to a recovery here.

The fact that the ticket here was handed to the libellant and that she filled in some blank spaces under the caption: "Passengers will please fill in the following information required for United States authorities" did not apparently change the situation so as to make these conditions any more binding upon her than would have been the case if regarded as mere notices, not effective unless it appeared that she read and adopted them. New York, N. H. & H. R. R. Co. v. Sayles, 87 Fed. 444, 32 C. C. A. 485; The Majestic, 166 U. S. 375, 17 Sup. Ct. 597, 41 L. Ed. 1039.

If I am correct in holding that the loss in this case was the result of a theft on the part of a servant, or servants, of the ship, it seems unnecessary to consider at length the various defenses put forward, but it remains to notice some of them.

2. The libellant has in my judgment made a case of more than negligence.

3. Section 4281 of the United States Revised Statutes [U. S. Comp. St. 1901, p. 2942] provides in effect, that shippers of gold and jewelry, including precious stones, shall when lading the same as freight or baggage give to the agent of the ship a written notice of the true character and value thereof and have the same entered on the bill of lading; that otherwise, the master and owner of the vessel shall not be liable beyond the value according to the notice. Nothing of the kind was done here. The passenger simply took her jewelry, such as she had been accustomed to wear and carry, aboard, and endeavored to deposit it with the purser for safe keeping. She failed in so depositing it, not through any fault of her own, and she was robbed of it the first night out. I have been referred to no authority which holds that the statute applies to such a case and it seems unreasonable to deprive a passenger of her right against the ship by the force of the statute, which does not seem to have been designed for such a purpose, and I hold that it affords no defense.

4. With respect to notice of the loss not having been given within 48 hours of the time when the passenger landed, the steamer was made fast to the wharf, on arrival in New York, about 10 minutes past 2 o'clock P. M. on the 10th of November. The notice was mailed in a postal chute at 5:30 P. M. on the 12th and received by the steamship's agent the morning of the 13th. This was not a strict but it was a reasonable compliance with the provision of the ticket, especially in view of the fact that the master and purser of the ship, knew all the particulars of the passenger's claim almost immediately after the happening of the loss. The whole purpose of the notice was accomplished promptly.

5. This is disposed of above.

6. The ship can not be held harmless because of the nature of the act of the servant.

7. This is also disposed of above.

8. It was very natural under the circumstances of the case that the stateroom door should be left open. It is shown that it was necessary for ventilation and that it was proper in view of the expectation on the part of the libellant that she would be enabled to deposit the jewelry with the purser, before retiring finally. ·

Upon all the circumstances of the case, I feel constrained to hold the ship liable.

Decree for the libellant, with an order of reference