## THE TORONTO.

(District Court, S. D. New York. November 24, 1908.)

SHIPPING (§ 141*)—DELAY IN DISCHARGING CARGO—LIABILITY OF VESSEL.

Delay in discharging cargo and consequent damage. A general strike of longshoremen in New York prevented the timely discharge of a shipment of onions from Hull, England. A strike clause in the bill of lading provided that the ship should not be responsible for strikes and stoppage of labor. *Held* that the clause constituted a defense.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 141.*]

(Syllabus by the Judge.)

Charles Caldwell, for libellants.

Wing, Putnam & Burlingham, for respondent.

ADAMS, District Judge. This action was brought by W. N. White & Company against the steamship Toronto and the Wilson Steamship Company to recover the damages, said to amount to $2,600, caused by delay in the delivery in New York of 4,000 bags of onions, shipped from Hull, England, by John Seeds & Sons, on the said steamer on or about May 10, 1907, for delivery to the libellants, who were the owners and consignees thereof. The libel alleges, in substance, that when the onions were loaded on the steamer they were in a sound condition; that the bill of lading called for the delivery thereof in equally good order to the libellants in Boston or New York, according to the option of the libellants, who notified the steamship to deliver them in New York; that the steamer arrived in Boston on or about May 20, 1907, and instead of remaining there the usual time of three days, she remained upwards of eight days and there was no cause or necessity requiring her to remain there beyond the usual time; that the steamer failed to proceed with due speed upon her voyage to New York and arrived late and instead of landing the onions at the regular and proper place, she proceeded to the Phœnix Pier in Hoboken and remained there for upwards of four days and that when she came to her usual place of discharge, the Wilson Line Pier at New York City, to land the onions, they had been damaged by the unusual and unnecessary length of time they had remained on the steamer, the usual voyage being sixteen days, and upwards of thirty days elapsed between the first sailing and delivery, whereby the alleged damages were caused.

The answer admits the shipment and the notice with respect to delivery in New York; that the steamer arrived in Boston May 25, 1907, and sailed thence to New York June 5, 1907, and proceeded to the Phœnix Line Pier at the foot of 7th Street, Hoboken, N. J., where she arrived June 6, 1907, and where she discharged most of her cargo and was ready and willing to discharge the onions in question and would have done so had the libellants not demanded that they should be discharged in the Borough of Manhattan in the City of New York. The answer admits that after discharging cargo in Hoboken she proceeded to pier 50, North River, Manhattan, where she discharged the onions and delivered them to the libellants who accepted the same and paid freight thereon. After some formal admissions and denials, the answer stated:

"Seventh. Further answering, the claimant alleges as follows:

It is a British corporation, having its principal office in Hull, and is the owner of the steamship Toronto, which it employs in regular freight and passenger service between Hull and Boston and New York. The Toronto is a steel screw steamship 3949 tons net register, built in 1900, and hails from Hull. At the times mentioned in the libel, and particularly when she received on board the merchandise mentioned in the libel, she was tight, staunch, and seaworthy, and in all respects well manned, equipped, supplied and fitted for the business in which she was engaged.

In the month of May 1907, said steamship, then lying in the port of Hull and bound for Boston and New York, loaded a general cargo, including 4000 bags of onions shipped by John Seeds & Sons. Bills of lading were duly issued for said onions, to which the claimant begs leave to refer and make a part of this its answer. By said bills of lading it was, among other things, agreed that said bags of onions should be delivered at the port of Boston, consignees to have the option of taking delivery in New York on giving no-

tice to steamer's agents before steamer's arrival at Boston. Said bills of lading contained, among other clauses, the following:

'Ship not responsible for defective marks on bags or condition of contents.'

'Riots, strikes, tumults, lookouts, stoppage of labour from whatever cause and consequent delays and loss or damage by force or otherwise * * * excepted.'

'Weights, measures, contents, number, quantity, quality, and value unknown. Ship free of * * * breakage, corruption, decay, rain, spray, sweating, loss or damage from stowage or contact with or smell or evaporation from any other goods.'

'With liberty in the event of the steamer putting back to port of loading, or into any other port or place, or otherwise being prevented (temporarily or otherwise), from any cause, from commencing or proceeding or continuing in the ordinary course of her voyage, to proceed under sail, or in tow of any other vessel, or in any other manner which the shipowner or those in charge of the ship shall think fit; and to ship and tranship the goods into any other vessel for any purpose.'

The Toronto sailed from Hull with said merchandise on board and proceeded to Boston, where she arrived on or about Saturday, May 25th, 1907. Before her arrival in Boston her agents were notified by the libellants that they would take delivery of their consignments of onions in New York. On June 5th, 1907, the Toronto sailed from Boston to New York, where she arrived on June 6th. At that time there was a strike of stevedores and longshoremen in the port of New York and all steamships had been generally delayed in discharging and loading their cargoes and all steamship piers were full of cargo. Owing to the strike the Toronto was unable to proceed to her usual pier, No. 50, North River, all berths at such pier being occupied and the pier itself being full of cargo. Accordingly, she proceeded to the Phœnix Line Pier at the foot of 7th Street, Hoboken, and began the discharge of her New York cargo there. Due notice was given to the libellants by the agents of the Toronto, and the steamship was ready and willing to discharge their consignments at the Phœnix Line Pier and make delivery of her cargo there, but the libellants refused to accept the cargo there, although Hoboken is within the port of New York, and insisted that their consignments of onions should be delivered in the Borough of Manhattan, New York City. Accordingly as soon as it was possible for the Toronto to discharge the rest of her New York cargo in Hoboken and a berth could be obtained in New York City, the Toronto proceeded from Hoboken to Pier 50, North River, and there discharged the libellants' onions and delivered the same in the like order and condition in which they were received to the libellants or their assigns, who received and accepted the same, giving clean receipts therefor, with the exception of certain minor notations, and paid freight thereon.

It the libellants' onions were damaged at any time, which the claimant denies, such damage was not due to any negligence on the part of the Toronto or this claimant which performed all the terms and conditions of the contract of shipment."

The first serious dispute of fact is whether there was any delay in Boston.

The libellants claim that the Toronto remained in Boston 6 to 8 days longer than necessary and that she then deviated from her course and went to Hoboken where she remained 5 days more during which time the damage to the onions was done. It was abundantly proved that the onions were seriously damaged when delivered in New York but it does not seem that such damage was attributable to the Boston (so called) delay. It was shown that the average time the steamer usually spends in Boston is about a week, sometimes the discharging and reloading there occupy 10 or 11 days. On this occasion she was there from May 25th to June 5th early in the morning. One of these days, May 30th, was a holiday, and it was not usual to work on Sun-

days. The period she remained there covered not only the holiday but two Sundays, May 26th and June 2nd. May 25th was occupied in preparing for discharge, in rigging tackle etc.; the next day was a Sunday. She worked, discharging and loading, May 27th, 28th, 29th and 31st. On June 1st it was raining and the stevedores would not work. June 4th she worked till midnight. Therefore there were six working days while she was in port, during which time she was reasonably occupied. According to the Custom House records she often used less time in Boston than she did on this occasion but that fact does not impose liability on the vessel for damage to perishable cargo by delay, especially where it is shown that no time was unduly lost by the steamer. The libellants have practically admitted that no loss was suffered by reason of any delay in Boston. On the 14th of June, they wrote to the steamer's agents:

"Had they (the onions) been landed last week, they would have been cleared ere this without any loss to anyone. I fear now there will be a serious loss to someone."

On the 5th of June, at 4 A. M., the Toronto sailed from Boston and arrived at the Phœnix pier in Hoboken June 6th at 11 A. M. She remained there until June 11th at 10 A. M., when she proceeded to pier 50 North River, the regular Wilson Line pier, where the onions were duly delivered. In the ordinary course, the steamer would have proceeded to and discharged at the New York pier. The reason she did not do so on this occasion was that there were labor troubles existing at the time and the New York pier, in consequence, was conjested with merchandise and vessels, hence it became necessary for her to go to Hoboken.

The libellants contend that going to Hoboken was a deviation from the voyage contemplated by the bill of lading. It is contended by the claimant that Hoboken is legally within the port of New York, which receives some countenance from the language of the libel as follows:

"I. That the libellants above named, W. N. White & Company purchased from John Seed & Son of Hull, England, 4000 bags of onions, which were shipped from * * * to be carried, transported and delivered to libellants, who are the owners and consignees of said onions, at the port of New York or Boston, at libellants' option, and when the said onions were placed aboard the said Steamship; * * * and under the contract which is the bill of lading under which said onions were shipped, the said onions were to be delivered in like good condition and order to the libellants at New York or Boston, according to the option of the libellants; and the libellants notified the said Steamship to deliver the same at the Port of New York."

It was testified by Mr. Von Schuckman, of the Hamburg-American Line:

"By Mr. Burlingham: Q. (repeated). Are you able to state what is included. as a matter of usage, among merchants within the port of New York, how extensive that is, in other words what it includes? A. All places within the jurisdiction of the port of New York; that includes Hoboken, Jersey City, Brooklyn, of course."

This is confirmed by the testimony of the resident manager of the Holland America Line and by Mr. Pentz, one of the claimant's firm.

Mr. White, one of the libellants, admitted that such was the case "for federal purposes."

The federal statutes provide (Rev. St. U. S. p. 498 [U. S. Comp. St. 1901, p. 1730]):

"Section 2535. There shall be in the State of New York ten collection-districts, as follows:

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Second. The district of the City of New York; to comprise all the waters and shores of the State of New York, and of the counties of Hudson and Bergen in the State of New Jersey, not included in other districts; in which New York shall be the port of entry. \* \* \*"

The limits of the port for delivery purposes have been discussed in Devato v. 823 Barrels of Plumbago (D. C.) 20 Fed. 510, where it was held that the legal limits of the port are such as are fixed by the United States and it is clearly recognized thereby that Brooklyn, for example, is a place for the proper delivery of New York cargoes as a part of that port.

The conclusion to be derived from the foregoing is that the claimant's contention is at least plausible but the contract provided:

"Consignees to have the option of taking delivery in New York on giving notice to steamer's agents, before steamer's arrival at Boston."

Such notice was given and it seems that the libellants were entitled to require delivery in New York, especially as the market for onions existed there and not in Hoboken. The case, however, does not depend upon this question for the determination of the controversy involved, which really turns upon the question of a strike.

Very full testimony was given by both sides upon that question, principally from railroad and steamship agents. The agent of the New York Central and Hudson River Railroad Company said he knew its men were dissatisfied with the rate of wages they were receiving; the agent of the Old Dominion Steamship Company said there were labor difficulties but that his company had in the neighborhood of 300 longshoremen in its employ in May and June; the agent of the Pennsylvania Railroad Company said that their men went out on a strike May 6th and it was May 11th "before we were normal"; the agent of the Ocean Steamship Company said that there was a general strike among steamship and coast lines in May and June; the Assistant Superintendent of the Atlantic Transport Line said they suffered from the labor troubles during May and until the middle of June and they were on account of it obliged to send their steamers away practically empty. The foregoing witnesses were called by the libellants; then the claimant called a number of witnesses on its behalf. The New York Manager of the Holland America Line said there was a general strike on from May 3rd up to June 15th of such a character that, referring to Hoboken, all that they could do was to discharge the inward cargoes. "We were not able to load any outward cargo at all because we did not have the proper men working, our regular men being out on a strike;" that as a rule they discharged their ships in about 2½ days and it took them all the time they were in port, about 7 or 8 days, and the condition was the same with the North German Lloyd and Hamburg-American Line.

that the strike was a general one also affecting New York; the agent of the Hamburg-American Line said the strike lasted 5 weeks and during that time they sent their ships back light; the Superintendent of the Anchor Line said there was a strike in May and June lasting from the 2nd or 3rd of May up to the 18th or 20th of June, during which they had to pick up strangers, and send their ships back light, owing to intimidation and threats notwithstanding police protection. Other witnesses testified to the same effect.

When the Toronto came into port it was found that she could not go to her regular pier because it was occupied by another vessel, detained there by the strike. The pier was congested with freight for the same reason. The Wilson Line endeavored to get men to do work at the pier by advertising and otherwise but without success. There can be no doubt that a very serious strike existed, which was delaying the loading and discharging of all ocean steamers, and that the incidents of the strike constituted sufficient reason for sending the steamer upon arrival in the port of New York to Hoboken for discharge. The strike was also affecting that place; whether it would have prevented a discharge there does not appear because the libellants insisted upon having the steamer bring their goods to New York City. Assuming that some damage was caused by going to Hoboken, the question is presented whether the strike was a sufficient excuse for the steamer's action.

The contract of shipment, evidenced by the bill of lading, contained the following:

"Ships not responsible for * * * strikes, * * * stoppage of labor from whatever cause and consequent delays. * * *"

The libellants urge that there was no strike but merely labor troubles, which could have been avoided by some increase in the pay of the stevedores. There was, however, a decided strike, that is, the stevedors refused to work at the old wages. No doubt, experienced stevedors could have been employed at the rate of wages they were striking for but even if it could be expected that vessel-owners should yield to the demands of workmen under the circumstances which prevailed here, the language of the contract goes farther and seeks to exempt them from the effects of the stoppage of labor and consequent delays. That there was a stoppage of labor is beyond question. It appears that the great majority, if not all, the experienced stevedores refused to work at the old wages. Some of the transportation companies yielded to the demands, or compromised with the men, so that to them the inconvenience incident to the stoppage was but temporary. Others, however, refused to yield and the strike continued for the greater part of the two months. The provisions of the contract, quoted above, were undoubtedly designed to cover a case of this kind and I am unable to see any reason why the vessel was not entitled to resort to the provision for a defense.

The libellants complain that the provision was printed in very small type, which is true. Agate was the size of this type and it was difficult to decipher. It did not stand out boldly as would be proper when a defense of the kind is relied upon, nevertheless it was there and with a fair amount of care could be seen. It is not like the case

of The Minnetonka (D. C.) 132 Fed. 52, affirmed 146 Fed. 509, 77 C. C. A. 217, where a provision in a passenger's ticket exempting the vessel from liability for the loss of a passenger's effects by theft of the shipowner's servants, printed in the same kind of type, was declared invalid, it being shown there that it had not been read by the passenger. No such proof was made in this case. Whether, if it had appeared here that the provision had not been read by the consignees, or their agents abroad, the same disposition would have been made of the matter, it is not necessary to determine. The presumption here is that the provision was read and understood.

It is also urged by the libellants that the Wilson Line did not fulfil its duties under the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), which provided that it shall not be lawful for a transporting vessel to insert in the bill of lading any clause whereby it—

"shall be relieved from liability from loss or damage arising from negligence, fault, or failure in properly loading, stowage, * * * care, or proper delivery of any and all lawful merchandise committed to its * * * charge. Any and all words or clauses of such import inserted in bills of lading * * * shall be null and void and of no effect."

No authority has been called to my attention which would prevent a vessel from including the above quoted clause relating to strikes and labor troubles in and among its lawful exceptions. The Harter Act has no effect upon the situation presented here. This is not a case of negligence.

The case of Blackstock v. The New York and Erie Railroad Company, 20 N. Y. 48, 75 Am. Dec. 372, is cited by the libellants in support of their contention that the strike clause was without effect and the carrier was responsible for the damages caused by a delay in transporting property which resulted from a strike. But it does not appear that there was any strike clause in that case. It was decided on the ground that the delay was caused by the action of the employés in suddenly and wrongfully refusing to work. The same is in effect true of other New York cases, where similar results were reached.

A decision more in point is Aktieselskabet Shakespeare v. Ekman & Co., 18 Times L. R. 605, decided by the English Court of Appeal in May, 1902. In that case there was a general strike of lightermen engaged in discharging vessels carrying the kind of cargo which the plaintiff's ship carried and such strike prevented the discharge. The report of the case is as follows: .

"Decision of Bigham, J. (17 Times L. R. 330), affirmed.

This was an appeal by the plaintiffs from the judgment of Mr. Justice Bigham, reported in 17 Times L. R. 330. The claim was for demurrage of the plaintiffs' ship the Shakespeare against the defendants, the charterers. By the charter-party, which was dated July 20, 1900, the ship was to load in the Skelleftea district a cargo of deals, battens, and firewood, and proceed therewith to one of the usual wood-docks in the River Thames as ordered on arrival at Gravesend. The cargo was to be discharged at the rate of not less than 18 fathoms per day of ordinary working days (Sundays and holidays excepted), ten days on demurrage over and above the lay-days at £8 per day; the lay-days to commence the day after the vessel was in a

berth in dock and ready to discharge. The charter-party provided that general strike of stevedores, lightermen, or dock labourers that might prevent the discharge of the cargo were always mutually excepted. The vessel was ordered to the Regent's Canal Dock, where she was berthed and ready to discharge on October 14. The lay-days began on October 15. The cargo consisted of 256 fathoms, which at the rate of 18 fathoms per day gave 15 lay-days. The discharge was finished on November 9, and the plaintiffs claimed eight days' demurrage. The defence was that the discharge was prevented by a 'general strike' of lightermen, and that the defendants were, by reason of the clause in the charter-party, not liable for demurrage. The question was whether on the facts there was a 'general strike' of lightermen which prevented the discharge within the meaning of the charter-party. The plaintiffs alleged that there was only a partial strike of lightermen. Mr. Justice Bigham came to the conclusion that there was a general strike of the lightermen who would in the ordinary course be employed in the discharge of such a cargo as that carried by the vessel, and that this strike prevented the discharge. He, therefore, gave judgment for the defendants.

Mr. D. C. Leck (Mr. J. A. Hamilton, K. C., with him) appeared for the plaintiffs; Mr. W. S. Robson, K. C., and Mr. Loehnis, for the defendants, were not called upon.

The court dismissed the appeal.

Lord Justice Vaughan Williams said that the first question was whether there was a 'general strike' within the clause of the charter-party. He did not think that 'general' was used in opposition to 'partial,' and, therefore, he did not think that it could be said that there was not a general strike merely because some as distinguished from all of the men were on strike. He thought that a strike was a general strike if it was not what he would call a particular strike. By a particular strike he understood a strike either by an individual workman or by a particular body of workmen working for a particular master. But if there was a strike against all the masters, and if that strike was taken part in by the workmen irrespective of the masters for whom they were working, that amounted to a general strike. He did not intend to lay down any hard-and-fast definition of a general strike. It was enough in the present case to say that on the evidence here it was plain that there was a general strike among the lightermen in the port of London, and these particular men were called out in consequence of that strike. It was quite true that the strike was not a strike of all the lightermen. There was no strike amongst the coal lightermen. There was, however, a strike of all the lightermen who were engaged in this particular class of lightering—namely, timber lightering, and in consequence of that general strike these men went out on strike, and the union would not allow other men to take their places. There was, therefore, a general strike. He also agreed that the strike prevented the discharge.

Lord Justice Romer concurred, and said that the question was simply one of fact, and there was no question of principle involved.

Lord Justice Mathew concurred."

I conclude, not without some hesitation, that the strike and labor clause here constituted a defense and that the libel should be dismissed.